# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCHES OF: ) | **FILED UNDER SEAL** |
| ) | |
| **4425 RENA ROAD, APT 202** ) | MISC. NO.: ~~17 - 3144TJS~~ |
| **FORESTVILLE, MD 20746** ) | |
| **(TARGET LOCATION #1)** ) | |
| ) | |
| **1851 ADDISON ROAD SOUTH** ) | MISC. NO.: ~~17 - 3145TJS~~ |
| **DISTRICT HEIGHTS, MD 20747** ) | |
| **(TARGET LOCATION #2)** ) | |
| ) | |
| **14301 OWINGS AVENUE** ) | MISC. NO.: ~~17 - 3146TJS~~ |
| **BRANDYWINE, MD 20613** ) | |
| **(TARGET LOCATION #3)** ) | |
| ) | |
| **5709 CYPRESS CREEK DRIVE, APT 302** ) | MISC. NO.: ~~17 - 3147TJS~~ |
| **HYATTSVILLE, MD 20782** ) | |
| **(TARGET LOCATION #4)** ) | |
| ) | |
| **BLACK FORD EXPLORER** ) | MISC. NO.: ~~17 - 3148TJS~~ |
| **DC TAG FC6590** ) | |
| **(TARGET VEHICLE)** ) | |

2008 KS

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH AND SEIZURE WARRANTS

I, Kevin T. Smith, Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF"), Washington Field Division, Washington, D.C. (hereinafter "Affiant"), being

duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Title 18, United State Code Section, 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for the offenses

enumerated in Section 2515 of Title 18, United States Code.

2.      I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. I have participated in investigations involving the possession of firearms by prohibited persons, the possession of illegal firearms, and the illegal acquisition of firearms by both prohibited and non-prohibited persons. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies.

3.      Through instruction, training, and participation in investigations, as well as through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which firearms traffickers and narcotics traffickers conduct their illegal business, including the transportation of firearms or narcotics from importers to wholesalers and from wholesalers to street level dealers, as well as the packaging and hiding of firearms and narcotics, payment methods for firearms or narcotics, and laundering of the proceeds of illegal firearms and narcotics transactions. I also know through training and experience that firearms distributors and narcotics distributors frequently change their places of residence and/or their primary places of conducting their illegal transactions so as to avoid working from a fixed location where they might be the subject of physical surveillance by law enforcement authorities, and often do not have legitimate employment or sources of income.

4.      From experience and training, your Affiant has learned that firearms traffickers and narcotics traffickers rarely refer to firearms and narcotics by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the firearms or narcotics using seemingly innocent terms or coded language. Firearms and narcotics traffickers also use the electronic communications (text messages) capability of their cellular telephones to conduct, facilitate, and further conceal their illegal activities. Your Affiant also knows that drug traffickers frequently have access to several cellular telephones and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to thwart law enforcement.

5.      Based on my training, experience and participation in narcotics investigations, and the training and experience of other agents and detectives with whom I am working closely in this investigation, I know that:

a.      Individuals who deal in illegal controlled substances keep such controlled substances, as well as paraphernalia, in their residences, vehicles, and in other locations, referred to as "stash houses." In addition, such individuals maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, etc., are maintained in locations to which drug traffickers  have ready access, such as in secure locations within their residences and their curtilage, the residences of family members, friends and associates, the places of operation of their drug distribution activities, such as stash houses or safe houses, in business locations with which the traffickers are associated, vehicles and in storage areas. I know that individuals involved

in narcotics distribution often maintain these records in hard and electronic copy for lengthy periods, i.e., months and years, and often hide them in places in their homes to avoid detection.

b.      Individuals who deal in illegal controlled substances routinely conceal in their residences and/or curtilage, vehicles, the residences of family members, friends and associates, as well as their business locations, storage areas, and/or in the places of operation of their drug distribution activities, such as stash houses or safe houses, large quantities of currency, financial instruments, precious metals, jewelry, and other items of value, typically proceeds of illegal controlled substance transactions.   Individuals who purchase and sell large amounts of illegal controlled substances often maintain a significant amount of narcotics proceeds in their homes. These individuals maintain cash in their homes, rather than depositing that money into a bank or other financial institution, in an attempt to avoid detection by law enforcement or by institutions that report to law enforcement.   Further, these individuals also secrete drug proceeds in their vehicles in an attempt to avoid detection by law enforcement and other persons.

c.      Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers that reflect names, addresses and/or telephone numbers for their associates in their illegal organization.  These individuals often utilize cellular telephones, social media, and telephone systems to maintain contact with their associates in their illegal businesses.  These telephones, along with telephone records, bills, address books and telephone numbers, are often found in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses or storage areas.

d.      Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property, and illegal contraband.   These photos are usually

4

maintained in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses, safe houses, or storage areas.

e.      Persons who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods, i.e., months and years. This documentary evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of their drug distribution activities, such as stash houses or safe houses, or in storage areas. This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, airplane and bus tickets and receipts, car rental receipts, amounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions, and records indicating the existence of storage facilities used in narcotics trafficking.

f.      Individuals who are members of ongoing drug organizations stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

g.      Drug traffickers will often store firearms near their illegal narcotics to protect the enterprise from other traffickers, robbers and law enforcement. Drug traffickers who own or possess firearms and ammunition, also keep other firearms related equipment, to include ammunition magazines, holsters, bullet proof vests, pistol grips, boxes, cleaning kits and

paperwork relating to the acquisition an disposition of firearms.  Drug traffickers keep firearms, ammunition and their accessories secreted within their vehicles, residences, and the residences of others for extended periods of time, i.e., months and years.  Lastly, drug traffickers do not usually carry their entire inventory of ammunition or equipment while carrying their firearms on their person or in a vehicle, but will keep their available ammunition and magazines in their residence for future use.

6.       As described in greater detail below, the investigation has revealed that the individuals listed in this affidavit are participating in a conspiracy to distribute and possess with intent to distribute controlled substances and that the fruits, evidence, and instrumentalities of violations of the following federal offenses, among others, are likely presently to be found at the addresses for which authority to search is sought herein:  (i) Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense or Violent Crime, in violation of Title 18, United States Code, Section 924(c)(1); and (ii) Unlawful Possession of a Firearm and Ammunition by a Person convicted of Crimes Punishable by Imprisonment for a Term Exceeding one Year, in violation of Title 18, United States Code, Section 922(g)(1); (iii) possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit such offenses, in violation of Title 21, United States Code, Section 846; (iv) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of Title 21, United States Code, Section 843(b); and (v) the laundering of proceeds of specified unlawful activity, i.e., distribution of controlled substances, in violation of Title 18, United States Code, Sections 1956 and 1957; (hereinafter collectively referred to as the "Target Offenses").  Specifically, there is probable cause to believe that within the confines of the Target Locations and Vehicle there exists evidence and

instrumentalities of the Target Offenses, as set forth more fully in the Attachments A and B, incorporated herein by reference.  The **Target Locations and Target Vehicle** are as follows:

<u>Target Locations and Target Vehicle:</u>

1.      4425 Rena Road, Apartment 202, Forestville, Maryland 20746 (**Target Location #1**);

2.      1851 Addison Road South, District Heights, Maryland 20747 (**Target Location #2**);

3.      14301 Owings Avenue, Brandywine, Maryland 20613 (**Target Location #3**);

4.      5709 Cypress Creek Drive, Apartment 302, Hyattsville, Maryland 20782 (**Target Location #4**); and

5.      2008 Ford, Explorer, black in color, bearing District of Columbia registration, FC6590, Registered to JAMAR GAGE (**the Target Vehicle**).

7.      All information in this affidavit is either personally known to me, has been related to me by other law enforcement officers and/or confidential sources, or has been related to me by records and documents gathered during this investigation, court-authorized interception of wire and electronic communications, controlled purchases of illegal drugs, physical surveillance, and other information gathered during the course of this investigation.  This affidavit contains information necessary to support probable cause for the search warrants.  It is not intended to include each and every fact and matter observed by me or known to the government.  Your Affiant has set forth only the facts that your Affiant believes are necessary to establish probable cause for the issuance of the search warrants requested herein.  References to intercepted telephone

conversation are made in this affidavit, but only a sampling of pertinent calls are summarized herein.  This is for illustrative purposes, and is by no means an exhaustive list or recitation of the relevant conversations that were intercepted.

## INVESTIGATION BACKGROUND

8.      In June of 2014, ATF Washington Field Division Group III commenced an investigation into a violent drug trafficking organization, the MARSHALL Drug Trafficking Organization (MARSHALL DTO), led by Jahi MARSHALL (MARSHALL).  The MARSHALL DTO is a poly-drug trafficking organization responsible for the procurement, transportation, distribution and sale of large amounts of cocaine, cocaine base (crack), heroin, fentanyl, and phencyclidine (PCP), in the District of Columbia, Virginia, and Maryland.  This organization operates within the residential streets and the local public housing projects in the Washington, DC, metropolitan area.  This area includes 16th Street, SE, W Street, SE, V Street, SE, Galen Street, SE, Green Street, SE, and Good Hope Road, SE.

9.      In December of 2015, ATF Special Agents (SAs) and Task Force Officers (TFOs) conducted controlled purchases of illegal narcotics from MARSHALL, BRIONTA TURNER (hereinafter TURNER), and other members of the MARSHALL DTO with the assistance of paid ATF Confidential Source #1 (CS-1) and ATF Confidential Source #2 (CS-2 and collectively the CSs), who have purchased suspected heroin and PCP.  The information supplied by the CSs has been corroborated to the extent possible by independent investigation, which has included, but is not limited to, pen registers, physical surveillance, video surveillance, and other independent sources.  The CSs used in this investigation have never been known to give false information while cooperating with law enforcement and their information has been deemed reliable.  CS-1 has a criminal history that includes felony narcotics and forgery convictions.  CS-2 has a criminal history

that includes a felony narcotics conviction.    During the course of the CSs' assistance with law

enforcement, the CSs have proven to be credible and reliable.

10.    Utilizing the CSs, ATF has, on at least 30 occasions starting in December 2015

until at least April 2017, purchased or attempted to purchase illegal narcotics from MARSHALL,

TURNER and other co-conspirators.  During the investigation, ATF has purchased or seized from

MARSHALL, TURNER and their co-conspirators more than 210 grams of heroin, 500 grams of

cocaine, more than 1/2 kilogram of PCP and 1 pound of Marijuana.  Also during the investigation,

including currently, law enforcement has conducted extensive surveillance in the area of 16th and

W Streets, SE, during all hours of the day and night and has consistently observed MARSHALL

and other members of the DTO making narcotic sales in the area of 16th and W Street SE.

11.    On March 27, 2017, the Honorable Rudolph Contreras of the United States District

Court for the District of Columbia, in Misc. No. 17-mc-665, authorized the interception of wire

and electronic communications on cellular telephone number (202) 294-0213, the cellular

telephone used by MARSHALL (Telephone 1). Interceptions began on March 28, 2017, and

ceased on April 26, 2017.

12.    On May 8, 2017, the Honorable Rudolph Contreras of the United States District

Court for the District of Columbia, in Misc. No. 17-mc-665, again authorized the interception of

wire and electronic communications from MARSHALL's Telephone 1.  Interceptions began on

May 8, 2017, and ceased on June 6, 2017 KS, and was sealed before Honorable Rudolph Contreras on

June 07, 2017.

13.    On July 20, 2017, the Honorable Judge Rudolph Contreras of the United States

District Court for the District of Columbia, in Misc. No. 17-mc-1710, authorized the interception

of wire communications on cellular telephone number (305) 680-7038, the cellular telephone used by GAGE (Telephone 2). Interceptions began on July 21, 2017 and ceased on August 16, 2017.

14.     During the MARSHALL Title III interception, law enforcement identified an individual known as JAMAR GAGE (hereinafter GAGE). Based on the activations intercepted between MARSHALL and Jamar GAGE, your Affiant along with other members of law enforcement determined that GAGE is a frequent PCP supplier to MARSHALL. GAGE was positively identified through wire intercepts, surveillance, employment verification and vehicle ownership. On several occasions, Agents observed GAGE meet with MARSHALL after Agents intercepted telephone calls where GAGE and MARSHALL agreed to meet in order to conduct narcotics transactions. Based on the intercepted calls and information obtained from physical surveillance agents were authorized to intercept GAGE's cellular telephone number.

## PROBABLE CAUSE FOR TARGET LOCATIONS/VEHICLE

A.     **Target Location #1 – 4425 Rena Road, Apartment 202, Forestville, Maryland 20746**

15.     Based upon the investigation and as discussed more fully below, **Target Location #1** is known to be a residence of DAVON SPENCER. During the Title-III investigation, MARSHALL had sixty-four (64) total activations, via voice call and text message, with telephone number (202) 758-9527. The subscriber name of telephone number (202) 758-9527 is an individual identified as "Pug Jones." Through further investigative means, discussed more fully below, it was determined that "Pug Jones" is DAVON Tyshawn SPENCER (hereinafter SPENCER).

10

16.     SPENCER is a black male born April X 1975, approximately 5'1", 140 pounds with Social Security Number xxx-xx-xxxx and FBI Number 391370VA4.  He has the following criminal convictions:[1]

| Date | Offense | Disposition |
|------|---------|-------------|
| 02/15/1996 Washington, D.C. | Assault with intent to kill X 2 | Guilty 5-15 years X2 to run concurrent |
| 07/17/2001 Washington, D.C. | Possession of a Firearm During a Crime of Violence Assault with intent to kill while armed Solicitation to commit murder | 70 Months, 3 years supervised release |

17.     On April 8, 2017, at approximately 0844 hours, in activation #642, MARSHALL sent an outgoing text message to SPENCER at (202) 758-9527 asking "wat time u be out." SPENCER replied in activation #643, "I am getting dressed now," to which, MARSHALL responded in activation #644, "Ok omw out."  SPENCER answered in activation #683, "I be over in 5 mins."  At approximately 1154 hours, MARSHALL sent a text to SPENCER, in activation #694, "down mom house." During this time, ATF was conducting a controlled purchase of narcotics from MARSHALL utilizing CS-1 and CS-2.  During the controlled purchase, Agents were conducting surveillance of 1630 Q Street SE, Washington D.C., a known address for SPENCER, and observed MARSHALL entering the porch area of 1630 Q Street SE and then shortly thereafter leaving the front area of the residence carrying a black bag. Agents observed MARSHALL place the black bag in the trashcan.  MARSHALL left the area driving a blue Toyota Corolla, bearing DC registration EZ1508, which registered to MARSHALL's mother, at 15 Riggs Road NE, Washington D.C.  The vehicle was parked adjacent to 1630 Q Street SE, on 17th Street

---

[1]     In compliance with Rule 49.1 of the Federal Rules of Criminal Procedure, only excerpts of certain personal identification information are included herein for privacy reasons. Such identifying information in full is available for the Court's inspection upon request.

north of Q Street S.E. Agents retrieved a black bag at the top of the other contents of the trashcan that they believe was the bag MARSHALL discarded. The black plastic bag contained two plastic juice-size bottles with liquid residue that emanated an odor consistent with PCP.

18.    On April 11, 2017, at approximately 0910 hours, in activation #909, MARSHALL sent a text message to SPENCER stating "we u at." At approximately 0922 hours, SPENCER replied via text message "down nana house." An ATF TFO traveled to the 1600 block of Q Street SE and observed two unknown black males and MARSHALL on the front porch of 1630 Q Street SE.

19.    On April 13, 2017, SPENCER's Federal Probation Officer confirmed that SPENCER's cell phone is (202) 758-9527. The Probation Officer also confirmed that SPENCER resides with his girlfriend Contina Cecilia Rudder at **Target Location #1,** and his grandmother Viola Washington resides at 1630 Q Street SE, Washington, D.C.

20.    On April 19, 2017, while searching SPENCER's Facebook account your Affiant observed a posting dated April 1, 2016, in which SPENCER posted his cell phone number as (202) 758-9527 stating "give me a call."

21.    On April 13, 2017, at approximately 0644 hours, in activation #1001, SPENCER sent a text message to MARSHALL stating "I be around." At approximately 0645 hours, in activation #1003, MARSHALL replied to SPENCER, "on my way out," which your Affiant knows from your Affiant's review of numerous activations that MARSHALL was traveling to the area of 16th and W Street SE, Washington D.C. At approximately 0832 hours, in activation #1007, MARSHALL sent a text message to SPENCER stating "out." At approximately 0902 hours, Agents surveilling 1630 Q Street, SE, observed SPENCER standing behind a red Dodge Journey

12

parked in front of 1630 Q Street, SE. Agents confirmed SPENCER's identity through known arrest photographs and profile photographs on social media accounts. The Dodge Journey bore D.C. registration FJ0178 which was registered to a Contina Cecilia Rudder of 919 F Street NE, Washington, D.C. Your Affiant is aware that Contina Cecilia Rudder is the girlfriend of SPENCER.

22.     On April 15, 2017, at approximately 1811 hours, in activation #1222, MARSHALL called SPENCER and told SPENCER that he was seeing what's going on and that "I got you though." MARSHALL told SPENCER that "we ain't do nothing, but if you come back out just call me . . . and I'll probably step outside." Your Affiant believes that in this activation MARSHALL and SPENCER are discussing supplying narcotics to one another.

23.     On October 11, 2017, SPENCER's US Probation Officer (PO), Hillary Wilburn, advised investigators that Davon SPENCER is still utilizing cellular telephone number (202) 758-9527. The PO also confirmed that SPENCER continues to reside with his girlfriend Contina Cecilia Rudder at **Target Location #1**.

**B.     Target Location #2 – 1851 Addison Road South, District Heights, Maryland 20747**

24.     Based on information obtained during this investigation and discussed more fully below, **Target Location #2** is known to be the residence of BRIONTA TURNER. During the Title-III investigation, MARSHALL had one hundred fifty-six (156) activations via voice call and text message with telephone number (301) 379-6753. Some of those activations will be discussed below. The subscriber name, of telephone number (301) 379-6753, is an individual identified as "Brionta Turner."

13

25.     TURNER is a black male born May X, 1977, approximately 5'9", 180 pounds with Social Security Number xxx-xx-xxxx and FBI Number 864352XA6.  TURNER has the following criminal convictions.

| Date | Offense | Disposition |
|------|---------|-------------|
| 6/6/1995<br>District of Columbia | Distribution of Cocaine | **Distribution of cocaine 2-6 years consecutive** |
| 8/12/1995<br>District of Columbia | Carrying Pistol Without License | **Guilty 1-3 years concurrent w/VA 180 Days** |
| 10/02/1996<br>District of Columbia | Possession with Intent to Distribute Cocaine | **Guilty 6 months consecutive** |
| 09/09/2007<br>Prince George's County, MD | Possession of Marijuana | **Guilty** |
| 10/03/2008<br>District of Columbia | PWID Cocaine, PWID Marijuana, Eluding, Operating after Revocation | **Plea Judgment Guilty for Attempted operating after suspension** |
| 12/27/2008<br>District of Columbia | Possession of Marijuana | **Guilty sentenced to 90 days** |
| 8/07/2010<br>District of Columbia | PWID Crack Cocaine | **Guilty sentenced 10 days** |

26.     During the course of this investigation TFOs and Agents have conducted three (3) controlled purchases of heroin directly from TURNER, however TURNER was present during a majority of the controlled purchases between CS-1, CS-2, and MARSHALL.  As briefly described below, CS-1 and/or CS-2 have, collectively, engaged in approximately thirty (30) controlled purchases of heroin and/or crack cocaine from MARSHALL and TURNER.

27.     On June 12, 2016, CS-1 called TURNER, who through the investigation was determined to be an associate of MARSHALL.  MARSHALL had previously instructed the CSs to contact TURNER if they were unable to reach MARSHALL.  The CSs were previously provided with TURNER's telephone number of (301) 379-6753.   TURNER informed CS-1 that

MARSHALL was trying to contact him/her and instructed CS-1 to call MARSHALL.  On June 12, 2016, CS-1 called MARSHALL.

28.     On November 8, 2016, CS-1 received a phone call from TURNER's telephone number (301) 379-6753.  CS-1 answered the phone and recognized the caller as MARSHALL. MARSHALL called CS-1 utilizing TURNER's cell phone in order to arrange a controlled purchase of heroin for the following day.  During this conversation, MARSHALL agreed to meet with the CSs to sell them heroin.  On November 9, 2016, The CSs met with MARSHALL in the area near the intersection of 16th and W Streets SE, where MARSHALL sold them 10 grams of heroin for $1,000.00.

29.     On February 19, ~~2016~~ 2017 KS, the CSs conducted a controlled purchase of .9 grams of suspected heroin from Brionta TURNER.  The CSs traveled to the area of 16th and W Streets SE, Washington, D.C., where they met TURNER at their vehicle.  At the conclusion of the controlled narcotics purchase from TURNER, the CSs purchased approximately four (4) bags of suspected heroin from TURNER.  After TURNER gave the CSs the heroin, one of the CSs exited the vehicle and walked with TURNER to a convenient store located on the corner of 16th and W Streets SE, Washington, D.C.  While inside the store, the CS stated that he/she paid TURNER eighty (80) dollars US currency for the suspected heroin. During the February 19, 2017 controlled purchase, TURNER requested a telephone number from the CSs in order to coordinate future narcotics transactions.

30.     On February 23, 2017, the CSs called TURNER at cellular phone number (301) 379-6753 in order to arrange a meeting to purchase narcotics on February 24, 2017.  TURNER agreed to the meeting. On February 24, 2017, the CSs purchased 6.2 grams of suspected heroin

from TURNER for six hundred (600) dollars US currency. Agents took custody of the suspected heroin, which later field-tested a positive for the presence of opiates.

31.    On March 30, 2017, at approximately 1931 hours, in activation # 114, MARSHALL receives a call from TURNER asking MARSHALL if "you made it in," and MARSHALL replied "nah I'm still outside."  TURNER then asked "you with Tight?"  Your Affiant is aware that the individual referred to as "Tight" is Anthony GAMBLE, a co-conspirator of MARSHALL and TURNER.  In the same activation, MARSHALL asked TURNER "yeah I'm about to roll out in a minute why what's up?" TURNER replied, "that niggah light got some bomb shit." MARSHALL replied, "yeah that probably came out tomorrow then finishing it now."  Your Affiant believes that MARSHALL and TURNER are referring to narcotics they obtained from an unidentified individual named "light" and MARSHALL stated that he did not finish selling the unknown quantity of narcotics he obtained from "light."

32.    On April 2, 2017 at approximately 2039 hours, in activation #279, MARSHALL placed an outgoing call to TURNER.  MARSHALL told TURNER that he was in the house and he has been there for about an hour.  During the conversation, TURNER asked MARSHALL "ain't nobody come out there and shit today."  MARSHALL replied, "you know the regular people." TURNER stated, "ya didn't get down though."  MARSHALL stated that an individual MARSHALL referred to as Little Kaylan purchased "some 5's and 10's.  TURNER responded, "oh yeah he did tell me though those joints probably gone."  MARSHALL stated, "I had got like two (2) 5's and one (1) 10 from him though."  From this activation, your Affiant believes that MARSHALL and TURNER are discussing some of the drug sales for the day.

33.    On April 8, 2017, Agents conducted a controlled purchase of narcotics from MARSHALL utilizing the CSs. At approximately 1145 hours, the CSs arrived in the area of 16th

16

and W Street, SE where they usually meet MARSHALL to purchase heroin from MARSHALL.
At approximately 1149 hours, in activation #691, TURNER sent MARSHALL a text message
stating "they are here," to which MARSHALL replied in activation #692, "make show they wat
the 20." TURNER responded in activation #693, "yea." At approximately 1201 hours, in
activation #695, MARSHALL told TURNER that he was waiting for someone he referred to as
"Bro," and asked whether "Bro" drove past TURNER. TURNER informed MARSHALL that the
CSs were waiting to purchase the narcotics from MARSHALL and MARSHALL responded that
he would text TURNER once he was on his way to the area of 16th and W Street. While waiting
for MARSHALL, TURNER conversed with the CSs. During the conversation, TURNER
discussed how he was "selling the shit, I was giving the shit away." TURNER stated how his
"cousin" would put "it on the scale, the bag weighed" various weights. TURNER said that the
"dope"…"it don't be the best shit." TURNER further stated that he received the "brown shit" and
that "they were loving that shit." From your Affiant training and experience, your Affiant believes
that TURNER was discussing the sale of heroin. TURNER also informed the CSs that a female
died "down the street" two days earlier because "I think she got some fentanyl."

34.     At approximately 1214 hours, TURNER informed the CSs that MARSHALL was
on his way to meet with the CSs. At approximately 1220 hours, in activation #701, MARSHALL
texted TURNER "omw" and TURNER replied in activation #702, "ok." Members of a surveillance
team observed MARSHALL leaving SPENCER's residence located at 1630 Q Street, SE,
Washington D.C.

35.     At approximately 1226 hours, MARSHALL approached the passenger side of the
CSs vehicle and handed the CSs the suspected narcotics in exchange for $ 2,000 in pre-recorded

US currency.  MARSHALL and TURNER then walked away from the vehicle and the CSs departed the area.

36.     During a search of various law enforcement databases, ATF agents located an address, 1851 Addison Road South, District Heights, Maryland 20747, **Target Location #2**, as a primary residence for TURNER.

37.     On August 16, 2017, law enforcement officers conducted a knock and talk at **Target Location #2**.  While at **Target Location #2,** the officers spoke with Mrs. Jovon Johnson, Jamani Johnson, and Brionta Turner Jr.  Mrs. Johnson, is the primary person on the lease for the **Target Location #2**.  Mrs. Johnson and TURNER have a child in common named  Brionta Turner Jr., and he also resides at **Target Location #2**.  During this meeting, Mrs. Johnson stated that TURNER occasionally stayed at **Target Location #2**, but it was not his primary residence.

38.     The officers also spoke with Brionta Turner Jr. at **Target Location #2**.  While speaking with Turner Jr., one of the officers observed an injury to Turner, Jr.'s hand.  Turner Jr. stated that his injury occurred on July 4, 2017, when fireworks detonated in his hand.  This fireworks incident is an active ATF investigation being handled by an ATF TFO.  According to the ATF TFO, he interviewed Turner Jr. on August 17, 2017, in the presence of his father, Brionta TURNER at **Target Location #2**.  The ATF TFO also stated that he and his partner interviewed TURNER and Turner Jr. on multiple occasion at **Target Location #2.**

C.     **Target Location #3 – 14301 Owings Avenue, Brandywine, Maryland 20747**

39.     Based on information obtained during this investigation, discussed more fully below, **Target Location # 3** is known to be the residence of JAMAR GAGE. A search of a law enforcement database shows that GAGE currently resides at 14301 Owings Avenue, Brandywine,

Maryland, **Target Location #3**. A law enforcement query also showed that this residence has a Verizon home telephone that is listed to Jamar GAGE. Agents have observed GAGE's vehicle, which is registered to him, parked in the driveway of this residence on numerous occasions.  In addition, Agents have observed GAGE standing in the driveway of the residence next to his parked vehicle.  Throughout the period of the court authorized interception of wire communications to and from GAGE's cellular telephone (305-680-7038), Agents received GPS data which provided location information regarding his cellular telephone.  Agents also received GPS data for GAGE's vehicle, the **Target Vehicle**, through a court authorized GPS car tracker. The GPS information regularly showed that GAGE'S cellular telephone and the **Target Vehicle** were in the area near **Target Location #3** during the evening and early morning hours. Based on your Affiant's training and experience with GPS data, your Affiant believes that this GPS information further corroborates Agents' belief that GAGE is residing at 14301 Owings Avenue, Brandywine, Maryland, **Target Location #3**.

40.     Law enforcement initially identified GAGE as a potential narcotics supplier based on a number of intercepted calls between MARSHALL using Telephone 1 and GAGE using Telephone 2.  For example, on April 1, 2017, at approximately 1242 hours (activation #219), MARSHALL used Telephone1 to call an unknown individual, who was later identified as GAGE, on Telephone 2 and said "OK," and GAGE responded by asking "same way?"  MARSHALL responded "yeah, yeah" and GAGE stated, "OK, I will be through there in a minute." On April 3, 2017, at approximately 1609 hours (activation # 305), MARSHALL used Telephone 1 and called GAGE on Telephone 2 and asked him "are you about ready to come around?" GAGE replied, "Yeah, I will be around there in a few." MARSHALL responded "OK, so like 1 and 1." GAGE answered "1 and 1, OK that's a bet." Based on my training and experience, in conjunction with

my knowledge of this investigation, I believe MARSHALL was ordering a quantity of narcotics from GAGE.

41.      On April 8, 2017, at approximately 1242 hours (activation # 717), MARSHALL used Telephone 1 to call GAGE on Telephone 2 and asked "hey, you around?" GAGE responded, "I should be around in 10 or 15 minutes." MARSHALL told GAGE to meet him at "Mama's house." At approximately 1331 hours, law enforcement officers observed a black Ford Explorer bearing District of Columbia license plates FC6590, (the **Target Vehicle**) stop at the intersection of 17th and Q Streets SE, a short distance from 1630 Q Street, which is a suspected stash house associated with MARSHALL and SPENCE, and sometimes referred to in intercepted calls as "mama's house." MARSHALL entered the aforementioned vehicle and sat in the front passenger seat for approximately one minute before exiting the vehicle. Law enforcement officers ran the black Explorer's license plates, and determined that the vehicle was registered to a JAMAR MALIK GAGE at 2243 Shannon Place SE Washington, D.C.

42.      A few days later, on April 11, 2017, law enforcement officers photographed GAGE as he exited the **Target Vehicle**, his black Ford Explorer bearing District of Columbia license tags FC6590, which was parked in front of 2243 Shannon Place SE. Law enforcement officers corroborated GAGE's identity on May 26, 2017, when they conducted a vehicle stop of the **Target Vehicle.** The driver, who matched the photograph taken of GAGE in front of the Shannon Place address, produced a valid District of Columbia driver's license in the name of JAMAR MALIK GAGE.

43.      During the period of interception on Telephone 2 utilized by Gage, Agents identified numerous activations, which Agents believe were attempts by GAGE to either obtain or sell quantities of narcotics. Specifically, on July 21, 2017, at approximately 1614 hours, in

activation #16, GAGE contacted telephone number 240-286-8306 subscribed to Jeffrey WINCHESTER (hereinafter WINCHESTER), who Agents believe to be a customer of GAGE's. During the conversation, GAGE asks WINCHESTER, "What you was trying to do?" WINCHESTER responds, "What I told you before, the whole one." GAGE further clarifies by asking WINCHESTER if he wanted, "the whole half?" WINCHESTER stated, "Well the one we talked about for right now," and stated, "cuz I'm gonna give that to somebody right now. The first one we talked about, the first one, the other one I'm gonna take with me. Somebody else wants that other one." GAGE informed WINCHESTER that he would call him back regarding his ability to meet to conduct what Agents believe to be a narcotics transaction. Based on your Affiant's training and experience, in conjunction with your Affiant's familiarity with this investigation, your Affiant believes that Jamar GAGE and WINCHESTER are speaking about quantities of PCP, with the terms whole and half referring to one (1) ounce bottles and half (.5) ounce bottles respectively.

44.     On July 24, 2017 at approximately 0932 hours, in activation #100, GAGE received an incoming call from telephone number 202-826-1070, which is subscribed to Christopher DIXON, who Agents believe to be a customer of GAGE.  During the conversation, GAGE asked DIXON, "What it look like for you today?"  DIXON replied, "Trying to get a whole joint from you." GAGE responded, "As soon as I shake loose, I will call you back and let you know." Based on your Affiant's familiarity with this investigation, your Affiant believes that DIXON is seeking to obtain one (1) ounce of PCP from GAGE, which is referenced in this conversation as, "a whole one."

45.     On August 3, 2017 at approximately 1146 hours, in activation #287, GAGE contacted telephone number 202-749-4779 which is subscribed to Louis CHEEVES. During the conversation, GAGE acknowledges that he missed CHEEVES' call on the previous night because

he had been working.  GAGE asked CHEEVES, "What happened man?" CHEEVES replied, "you missed a shenanigan, it was some money." GAGE replied, "You know how that go man. You know, you know that can always come around." CHEEVES stated, "Yea, they moved on, it was for Rob and them." Based on your Affiant's training, experience and knowledge of this investigation, your Affiant believes that on the night preceding the aforementioned telephone call, CHEEVES attempted to contact GAGE in order to obtain narcotics. Based on the content of the intercepted telephone call, your Affiant believes that CHEEVES sought to supply narcotics to another individual, but was unable to do so because he was unable to acquire narcotics from GAGE. CHEEVES informed GAGE that he had missed the opportunity to make some money, to which GAGE replied, "that can always come around." Based on your Affiant's training and experience your Affiant believes that this statement shows the ease and frequency with which GAGE believes he has the ability to make money through the sale of narcotics.

46.     On October 31, 2017, agents conducted physical surveillance at **Target Location #3** and at the Washington, D.C. Department of Public Works (DPW), 1725 15th Street, NE, Washington, D.C., where GAGE currently works. At approximately 0544 hours, the garage door of **Target Location #3** opened and Agents observed a black Ford Explorer, bearing Washington, D.C. license plate ending in 6590 (the **Target Vehicle**), driving out of the garage of **Target Location #3**. A bicycle rack mounted on the rear hatch of the vehicle partially obscured the license plate. The automobile, bicycle rack and license plate ending in "6590" are consistent with the vehicle that Agents have regularly observed Jamar GAGE operating. At approximately 0548 hours, the **Target Vehicle** was seen driving out of the residential neighborhood and turning north on Maryland Route 5/Branch Avenue.  At approximately 0630 hours, the **Target Vehicle** was observed turning right off of West Virginia Avenue, NE, onto Fenwick Avenue, NE, and parked

in the parking lot of the aforementioned DPW facility, the known workplace of Jamar GAGE. During the course of this investigation, Agents have observed aforementioned Ford Explorer (the **Target Vehicle**) on numerous occasions. Jamar GAGE has been the only individual observed driving this vehicle throughout the entirety of this investigation.

47.     On November 14, 2017, Agents reconfirmed through a law enforcement database that GAGE is listed as an occupant of **Target Location #3**.  Also listed as an occupant of **Target Location #3** is Latosha Renee Brock, a female who Agents believe to be romantically involved with GAGE. GAGE's and Brock's social media posts show both of them in numerous photographs together and with a juvenile who they both refer to as their son.

**D.**     **Target Location #4 -- 5709 Cypress Creek Drive, Apartment 302, Hyattsville, MD 20782**

48.     Based on information obtained during this investigation and discussed more fully below, **Target Location #4** is known to be the residence of ANTONIO TABRON, a narcotics trafficker associated with GAGE.  During the Title-III investigation, GAGE had fifty (50) total activations, via voice call and text message, with telephone number (240) 899-6370.   The subscriber name of telephone number (240) 899-6370 is an individual identified as "Antonio TABRON."  Based on previous investigations, your Affiant is familiar with TABRON and has identified TABRON as the user of (240) 899-6370.

49.     TABRON is a black male, born January x, 1972, approximately 5'8" tall, 230 pounds, with Social Security number xxx-xx-xxxx, and FBI number 408348LA4.  He has the following criminal convictions:

| Date | Offense | Disposition |
|------|---------|-------------|
| 5/11/1993<br>District of Columbia | Possession with intent to distribute while armed | **Disposition - Guilty**<br>**120 days incarceration** |
| 3/22/1997<br>District of Columbia | Possession with intent to distribute Heroin | **Disposition – Guilty**<br>**12 months probation** |
| 11/15/2001<br>District of Columbia | Conspiracy to Distribute five kilograms or more of cocaine and 50 grams or more of cocaine base | **Disposition – Guilty**<br>**90 months incarceration** |

50.     On July 26, 2017, at approximately 1153 hours in activation #129 of the T-III investigation of Jamar GAGE's cellular telephone, GAGE used Telephone 2 to make an outgoing call to TABRON at (240) 899-6370.  During the conversation TABRON said, "I was trying to go see your man again."  GAGE later asked TABRON, "…which way you was talking about?"  TABRON responds, "Same way as last time."  Based on your Affiant's training and experience, your Affiant believes that GAGE was asking TABRON what quantity of narcotics he was attempting to obtain.  TABRON responded that he was trying to get the same amount and type of narcotics as he did previously.

51.     On July 27, 2017, at approximately 1243 hours, during activation #142, GAGE used Telephone 2 to make an outgoing call to TABRON at (240) 899-6370.  GAGE told TABRON "…slim told me, he says hold fast for a second, he says it should be today…"  GAGE continued by saying, "making sure the pool right."  Based on your Affiant's training and experience, your Affiant believes that the term "pool" is a code word for PCP and that in this conversation GAGE was telling TABRON that GAGE's PCP supplier was preparing the PCP for sale and that it should be ready today.

52.     On July 27, 2017, members of the ATF conducted a controlled purchase of one (1) ounce of PCP from TABRON, utilizing ATF Confidential Source #3 (CS-3) and an ATF Undercover Agent (UC).   CS-3 has provided reliable information that has been independently corroborated throughout this investigation and has never been known to give false information while cooperating with law enforcement.   CS-3 is receiving subsistence funds in order to cover his/her expenses while completing actions at the direction of his/her controlling agent.   CS-3 has been arrested and convicted of several crimes, including carrying a pistol without a license, theft and uttering.   In the days leading up to the controlled purchase, CS-3 and TABRON agreed that CS-3 would purchase one ounce of PCP from TABRON for $300.   On July 27, 2017, in the presence of the UC, TABRON sold two (2) half-ounce vials of PCP for $300.   The UC identified TABRON as the seller of the PCP.   At the conclusion of the controlled purchase by CS-3 from TABRON, an Agent took custody of a Newport cigarette box containing the two (2) half-ounce glass vials that contained a green/yellow colored liquid that emanated the odor that is consistent with PCP.

53.     On July 28, 2017, at approximately 1917 hours, during activation #191, GAGE used Telephone 2 to make an outgoing call to TABRON at (240) 899-6370.   During the conversation TABRON told GAGE that he, "was trying to go over, uh, 16th place...you took so long so we went, umm, we went over to 8th." Based on your Affiant's training and experience your Affiant believes that TABRON was using coded references to "16" and "8" to refer to quantities of PCP. Later in the conversation TABRON asked GAGE, "...what's going to be the address on the, um, on that joint." Your Affiant believes that TABRON was asking GAGE what the price would be for the previously discussed quantity of PCP.  GAGE responded, "last time I talked to him man he said it was, uh, I think it was 13." Your Affiant believes that GAGE was

advising TABRON that his supplier was selling the quantity of PCP for $1300.

54.     On July 30, 2017, at 1520 hours, in activation #219, GAGE used Telephone 2 to call TABRON to set up what your Affiant believes was a narcotics transaction.  During the call, TABRON stated that he was riding his bicycle at the time and could not carry on a conversation. TABRON told GAGE, "Imma get to the house real quick. Imma be bout 10 minutes, get to the house." GAGE asked TABRON for his location at that moment and TABRON responded that he was riding his bike in Maryland near Chillum Road.  Based on your Affiant's knowledge of this investigation, your Affiant knows that 5709 Cypress Creek Drive (**Target Location #4**) is in close proximity to Chillum Road in Hyattsville, Maryland, and that TABRON's use of "the house," referred to his residence.

55.     On July 30, 2017, at 1608 hours, in activation #226, GAGE used Telephone 2 to make an outgoing call to TABRON at (240) 899-6370.  During the conversation, TABRON directed GAGE to where TABRON was located.  During the conversation, TABRON told GAGE, "Come down Chillum Road to 16th Street," and "make a left into the Chillum Road Apartments." TABRON also identified his street as "Cypress Creek Drive," **Target Location #4**.  Based on the aforementioned roads and descriptions, Agents were able to determine that TABRON was directing GAGE to an apartment complex, Landmark Apartments, in Hyattsville, Maryland, the site of **Target Location #4**.

56.     On August 25, 2017, members of the ATF, again, conducted a controlled purchase of narcotics and an attempted purchase of a Glock firearm from TABRON.  In the days before the controlled purchase CS-3 contacted an ATF Special Agent and informed her that an individual known to CS-3 as "Fat Cat" offered to sell CS-3 a Glock firearm for $600.00.

57.     At approximately 1126 hours, on August 25, 2017, in the area of 13th and Randolph

Streets NW, Washington D.C., a Federal Bureau of Investigation (FBI) Special Agent observed TABRON in a silver Toyota Corolla, bearing District of Columbia registration "FG 0830." At approximately 1130 hours, TABRON was observed inside CS-3's vehicle. Also in the vehicle was CS-1. TABRON then sold two (2) glass vials of PCP in exchange for $300. No firearm was exchanged. During this purchase, TABRON agreed that CS-3 could share TABRON's telephone number (240-899-6370) with CS-1. At approximately 1132 hours, TABRON was observed leaving the area in the silver Toyota Corolla. At the conclusion of the controlled purchase, an ATF Special Agent took custody of the two (2) glass containers of a yellow colored substance that emanated the odor consistent with PCP.

58.     On September 8, 2017, members of the ATF again conducted a controlled purchase of PCP by CS-1 from TABRON. At approximately 1449 hours, TABRON was observed driving a black in color vehicle in the area of 13th and Randolph Streets NW, Washington D.C. TABRON was then observed entering the passenger side of CS-1's vehicle. At this time, TABRON sold one (1) one-ounce bottle of PCP to C1-1for $300. Approximately 10 minutes later, TABRON was observed exiting CS-1's vehicle.   An ATF Special Agent took custody of the suspected PCP. According to CS-1, TABRON was carrying a black bag that contained multiple bottles of suspected PCP at the time of the controlled purchase of PCP. The CS was shown a photograph of ANTONIO TABRON and CS-1 identified TABRON as "Cat," the individual who sold the suspected PCP on August 25 and September 8, 2017.

59.     Law enforcement database checks reveal that Antonio TABRON was the passenger of a vehicle involved in a traffic accident on August 22, 2017, in Washington, D.C. The driver and registered owner of the vehicle was identified as Shenika Lynette Jones. Using law enforcement databases, an ATF Special Agent identified Jones' current address as 14106

Brandywine Heights Road, Brandywine, Maryland 20613.  On November 2, 2017, Special Agents

conducted a knock and talk at the aforementioned residence and spoke with a male who identified

himself as Cornelius Jones, the son of Shenika Jones.  Cornelius Jones verified that TABRON was

Shenika Jones' brother.

60.    On November 3, 2017, based upon the July 30, 2017 activations between GAGE

and TABRON (activations #222 and 226) during which TABRON provided GAGE with location

information for **Target Location #4**, Special Agents interviewed employees of the leasing office

at the Landmark Apartments in Hyattsville, Maryland.  The employees identified **Target Location

#4** as being leased in the name of TABRON's sister, Shenika Jones.  Based upon this information,

the Special Agents went to 5709 Cypress Creek Drive and observed TABRON outside.  After

TABRON entered the address, Agents went to Apartment 302, **Target Location #4**, and knocked

on the door.  TABRON answered the door wearing clothing that was  different from what he was

wearing outside.  TABRON identified himself as Antonio TABRON and he provided (240) 899-

6370 as his telephone number.  The Special Agents also identified TABRON through known

photographs of TABRON and through their knowledge of this investigation.  TABRON was eating

a meal at the time of this interview and appeared to be in the home alone.  Your Affiant believes

that **Target Location #4** is TABRON's residence, but is being leased in the name of his sister on

his behalf.

**E.    Target Vehicle – 2008 Ford, Explorer, black in color, bearing District of
Columbia registration, FC6590, Registered to JAMAR GAGE**

61.    Based on intercepted telephone calls from Jahi MARSHALL and Jamar GAGE

utilizing Telephone 1 and Telephone 2, Agents believe that GAGE uses the **Target Vehicle**, a

black Ford Explorer bearing the District of Columbia Tag FC6590, to transport and or facilitate

his narcotics transactions and that evidence of these activities will be found in the **Target Vehicle**.

62.     On several occasions, physical surveillance has observed MARSHALL inside of the **Target Vehicle** in the vicinity of 16th and W Streets, SE, Washington, D.C.  Based on your Affiant's training and experience, in conjunction with your Affiant's knowledge of this investigation, your Affiant believes that GAGE's presence near the area of 16th and W Streets, SE, Washington, D.C., is for the purpose of conducting narcotics transactions with MARSHALL.

63.     On April 8, 2017, at approximately 1215 hours, surveillance units observed MARSHALL exiting 1630 Q Street SE, Washington, D.C.  MARSHALL proceeded to walk north on Q Street then west on 17th Street.  MARSHALL was seen by law enforcement discarding a small black bag into a trashcan in the alleyway behind 1535 17th Street, SE, Washington, D.C. Shortly after discarding the small black bag, MARSHALL departed the area.  An Agent then went to the trashcan, recovered the small black bag from the top of the inside of the trashcan. Inside the small black bag contained two small plastic juice bottles containing a clear liquid residue. The two bottles emanated a strong odor of PCP. Based on your Affiant's training and experience, in conjunction with your Affiant's knowledge of this investigation, it is a common practice for narcotic suppliers to store PCP in plastic juice bottles. On April 8, 2017, at approximately 1242 hours (activation # 717), MARSHALL used Telephone 1 to call GAGE on Telephone 2 and asked "hey, you around?" GAGE responded, "I should be around in 10 or 15 minutes." MARSHALL told GAGE to meet him at "Mama's house."  At approximately 1331 hours, Agents observed GAGE's Black Ford Explorer, the **Target Vehicle**, stop at the intersection of 17th Street and Q Street SE, Washington, D.C.  MARSHALL entered the **Target Vehicle** and sat in the front passenger seat for approximately one minute before exiting the vehicle. Based on your Affiant's

training, experience and knowledge of this investigation, Agents believe that MARSHALL and GAGE conducted a narcotics transaction inside of GAGE's vehicle, the **Target Vehicle**.

64.     On July 30, 2017, at approximately 1524 hours and 1551 hours, Agents intercepted several telephone calls between GAGE and TABRON (activations #219 and #222) where the two made arrangements to meet in order to conduct what Agents believe was a narcotics transaction.   During one of the telephone calls, TABRON mentioned that he would meet with GAGE, but TABRON was currently riding his bicycle. GAGE stated, "Yea, shit, I can uh. Man, I can meet you. I can come get you and shit. You can throw the bike on the back of the truck. I got the rack, I got the bike rack on the back of the truck." TABRON declined GAGE's offer to pick TABRON up.   However, the two made further plans to meet later in the day. Based on your Affiant's training and experience, this conversation shows GAGE's propensity to utilize his vehicle to facilitate narcotics transactions, and serves to further identify his vehicle. While conducting surveillance on GAGE, Agents regularly observed him operating the **Target Vehicle**, a black Ford Explorer with a black bicycle rack affixed to the rear of the vehicle, as stated in the intercepted telephone call.

65.     The **Target Vehicle** is regularly situated within the District of Maryland, within the jurisdiction of this Court.   As discussed above, the **Target Vehicle** is registered to GAGE and is regularly parked at GAGE's residence, **Target Location #3**.   Agents have observed the **Target Vehicle** at and near **Target Location #3** as recently as October 31, 2017, and GPS data received by Agents during the investigation through a court authorized GPS car tracker has confirmed that the **Target Vehicle** has been regularly situated in the area near **Target Location #3** during the evening and early morning hours.

///

17-3144TJS through 17-3140TJS

**CONCLUSION**

Based on the foregoing, I submit that there is probable cause to believe that, DAVON SPENCER, BRIONTA TURNER, JAMAR GAGE, ANTONIO TABRON and other individuals known and unknown, are conspiring to distribute and possess with intent to distribute controlled substances, and to commit the Target Offenses outlined above. Furthermore, there is probable cause to believe that evidence and instrumentalities of the crimes described herein and as set forth more fully in Attachment B to each warrant application, incorporated herein by reference, are contained or secreted within the confines of the **Target Locations and Vehicle**.

Special Agent Kevin T. Smith
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed to and sworn before me this _____ 20th _____ day of November, 2017.

HONORABLE TIMOTHY J. SULLIVAN
UNITED STATES MAGISTRATE JUDGE

31